IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cassandra Ann Goodwin, | ) | C/A No.: 1:16-1838-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be reversed and remanded for further
proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On July 17, 2012, Plaintiff filed applications for DIB and SSI in which she alleged
her disability began on December 31, 2010. Tr. at 191–92 and 193–201. Her applications

were denied initially and upon reconsideration. Tr. at 130–34, 139–40, and 141–42. On September 5, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 40–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 17, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 17–39. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 7, 2016. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 46. She completed high school. *Id.* Her past relevant work ("PRW") was as a cloth inspector, as a combined security guard and schedule clerk, and as a combined kitchen helper, sandwich maker, and fast food worker. Tr. at 71. She alleges she has been unable to work since December 31, 2010. Tr. at 191.

          2.     Medical History

Plaintiff presented to Charles Stroup, M.D. ("Dr. Stroup"), on May 25, 2010, and reported that she had stopped taking Diovan for hypertension because it caused her to experience hair loss and itching. Tr. at 296. Dr. Stroup prescribed 2.5 milligrams of Lozol and instructed Plaintiff to follow up for a blood pressure check in two weeks. *Id.*

On April 18, 2011, Plaintiff presented to the emergency room ("ER") at Spartanburg Regional Medical Center with a complaint of chest pain. Tr. at 396. A myocardial perfusion study showed Plaintiff to have a small perfusion abnormality at the anterior wall that most likely represented a breast attenuation artifact. Tr. at 377. Plaintiff's resting left ventricular ejection fraction was estimated to be 58% with visually normal wall motion. *Id.* A chest x-ray suggested enlargement of the central pulmonary arteries, but normal heart size. Tr. at 378. Plaintiff was discharged to follow up with Dr. Stroup for hypertension. Tr. at 395.

On June 14, 2011, Plaintiff informed Dr. Stroup that Lisinopril caused her to develop a cough. Tr. at 296. Dr. Stroup discontinued Lisinopril and prescribed Cozaar for hypertension. *Id.* Plaintiff complained of a trigger finger deformity in her right index finger. *Id.* Dr. Stroup indicated he would refer Plaintiff to an orthopedist. *Id.*

On August 16, 2011, Plaintiff reported a two-day history of headache. Tr. at 295. Dr. Stroup indicated Plaintiff's blood pressure was elevated. *Id.* He refilled Plaintiff's prescription for Cozaar 100 milligrams and added five milligrams of Bystolic, which was to be increased to 10 milligrams after seven days. *Id.*

On August 30, 2011, Dr. Stroup informed Plaintiff that she had impaired glucose tolerance and was at risk for diabetes. Tr. at 295. He noted Plaintiff was not taking her medication for hypertension. *Id.* Plaintiff weighed 275 pounds and her blood pressure was 170/80. *Id.* Dr. Stroup discussed dieting and stressed to Plaintiff that she needed to reduce her weight because she was at risk for developing diabetes and other complications. *Id.*

Plaintiff's blood pressure had improved, but continued to be elevated on October 11, 2011. Tr. at 294. Dr. Stroup noted that Plaintiff's weight had continued to increase and that she was likely 120 pounds overweight. *Id.* He indicated Plaintiff had a history of thyroid problems and a goiter, but was not taking her thyroid medication and was noncompliant with diet. *Id.* He prescribed Lozol 2.5 milligrams and instructed Plaintiff to lose four pounds over the next four weeks. *Id.*

On November 7, 2011, Dr. Stroup indicated Plaintiff's liver enzymes were elevated. Tr. at 293. He ordered a hepatitis panel, serum iron test, and complete blood count ("CBC"). *Id.* He instructed Plaintiff to return in two days to review the results. *Id.* He noted Plaintiff had borderline high glucose and indicated it could be a result of her weight and pre-diabetic situation. *Id.*

Plaintiff reported feeling weak and having no energy on November 9, 2011. Tr. at 293. Dr. Stroup indicated Plaintiff's hepatitis C panel was positive. *Id.* He noted Plaintiff had no insurance and stated he would attempt to refer her to an infectious disease clinic. *Id.*

Plaintiff presented to Theodore Joseph Grieshop, M.D. ("Dr. Grieshop"), for an infectious disease consultation on January 11, 2012. Tr. at 362. She indicated she typically consumed two alcoholic beverages per day. Tr. at 363. Dr. Grieshop indicated no abnormalities on physical examination. Tr. at 364. Plaintiff demonstrated fluent speech; intact cognition; normal cranial nerves; and normal cerebellar function. Tr. at 365. She was able to squat, heel walk, and toe walk. Tr. at 366. She had normal gait and normal strength in her upper and lower extremities. *Id.* She had 1+ deep tendon reflexes.

*Id.* Dr. Grieshop discussed treatment for hepatitis C. *Id.* He indicated he would obtain Plaintiff's lab test results and that she should follow up in four weeks. *Id.* He encouraged Plaintiff to stop all alcohol use. Tr. at 367.

Lab testing showed Plaintiff to have stage 4 fibrosis, which was consistent cirrhosis of the liver, and grade A3 inflammation, which was consistent with severe activity. Tr. at 524–25.

Plaintiff followed up with Dr. Grieshop on February 10, 2012. Tr. at 356. She reported having consumed four 24-ounce alcoholic beverages over the last month. Tr. at 357. Dr. Grieshop encouraged Plaintiff to avoid alcohol. Tr. at 359. He discussed with Plaintiff the course of treatment for hepatitis C. *Id.* He referred Plaintiff for an ultrasound of her liver and abdomen and instructed her to follow up after the ultrasound. Tr. at 360. He administered a hepatitis B vaccine. *Id.*

On February 17, 2012, an abdominal ultrasound indicated coarsened echotexture of the liver that was consistent with hepatocellular disease such as cirrhosis. Tr. at 435. It did not indicate focal masses. *Id.* Plaintiff's main portal vein was patent. *Id.* She had mild splenomegaly and no ascites. *Id.*

Plaintiff complained of anxiety and nervousness on February 29, 2012. Tr. at 350. Dr. Grieshop indicated he did not believe Plaintiff was acutely depressed. *Id.* Plaintiff reported back pain, but Dr. Grieshop indicated she would need to discuss pain issues with her primary care physician. *Id.* He indicated Plaintiff likely needed new glasses, but could not afford to visit an eye doctor. *Id.* He reviewed treatment of chronic hepatitis C with Peginterferon, Ribavarin, and Telaprevir. Tr. at 358. He explained that potential side

5

effects included thinning of hair, permanent vision loss, additional thyroid dysfunction, cardiopulmonary problems, gastrointestinal problems, musculoskeletal problems, dermatologic problems, anal-rectal problems, hematologic problems, and psychiatric problems. *Id.* He estimated Plaintiff had a 50% chance of sustained viral response. *Id.* He stated she would require 48 weeks of therapy with her history of cirrhosis. *Id.*

On March 29, 2012, Plaintiff reported symptoms that included fever, insomnia, blurred vision, eye pain, occasional eye burning, constipation, abdominal pain, and frequent headaches. Tr. at 346–47. Dr. Grieshop noted no abnormalities on physical examination. *Id.* He indicated Plaintiff had tolerated her first two weeks of treatment reasonably well. Tr. at 348.

Plaintiff complained of fatigue on April 18, 2012. Tr. at 340. She reported constipation, dry skin, frequent headaches, memory loss, and confusion. Tr. at 341–42. A physical examination was normal. Tr. at 342–43. Dr. Grieshop indicated Plaintiff was five weeks into treatment and was tolerating it reasonably well. Tr. at 343.

Plaintiff reported feeling tired all the time on May 10, 2012. Tr. at 335. She endorsed symptoms that included fatigue, weight loss, blurred vision, nausea, rash, frequent headaches, depression, memory loss, confusion, and loss of appetite. Tr. at 336–37. Dr. Grieshop observed no abnormalities on physical examination. Tr. at 337–38. He stated that Ribavarin was decreased to 600 milligrams daily because lab results from Plaintiff's last visit showed her to have developed anemia. Tr. at 338. He indicated Plaintiff's cirrhosis showed no apparent decompensation on therapy so far and that Plaintiff was tolerating treatment reasonably well. *Id.*

6

On June 7, 2012, Plaintiff complained that she had experienced frequent itching. Tr. at 330. She endorsed symptoms that included anorexia, blurred vision, constipation, abdominal pain, vaginal itching, and frequent headaches. Tr. at 331–32. Dr. Grieshop observed no abnormalities on physical examination. Tr. at 332–33. He noted that Plaintiff's lab work showed her hemoglobin to have dropped to 9.6. Tr. at 333. He stated he was hopeful that some of Plaintiff's side effects from Telaprevir would improve because she would be completing the medication the next day. Tr. at 333 and 334.

Plaintiff complained of constipation on July 5, 2012. Tr. at 323. She also endorsed symptoms that included eye irritation, abdominal pain, vaginal itching, frequent headaches, excessive thirst, and loss of appetite. Tr. at 324–25. Dr. Grieshop observed Plaintiff to have a two-centimeter soft tissue mass under her skin in her medial left arm, but he noted no neurological disturbance or signs of infection in the area. Tr. at 326. He recommended Plaintiff use Dulcolax for constipation. *Id.* He noted a diagnosis of anemia, but stated he was hopeful that it would improve after she stopped the Telapravir. *Id.* He recommended Plaintiff follow up with her primary care physician regarding her elevated blood pressure. *Id.* He indicated Plaintiff had responded well to hepatitis C treatment and had no apparent decompensation of cirrhosis on therapy thus far. Tr. at 327. He administered a second hepatitis B vaccine. *Id.*

On August 2, 2012, Plaintiff reported blurred vision, constipation, abdominal pain, muscle weakness, frequent headaches, foot tingling or burning, depression, anxiety, and memory loss. Tr. at 318–19. Dr. Grieshop noted Plaintiff was tearful, but indicated no other abnormalities on examination. Tr. at 320. He described Plaintiff's

thrombocytopenia and anemia as stable. *Id.* He noted Plaintiff had responded well to her treatment thus far. Tr. at 321. He prescribed Citalopram for depression. *Id.*

On August 30, 2012, Plaintiff complained of blurred vision, frequent headaches, depression, and memory loss. Tr. at 312–13. Dr. Grieshop noted no abnormalities on physical examination. Tr. at 314. He administered a third hepatitis B vaccine. Tr. at 315.

On September 27, 2012, Plaintiff reported financial pressure and a great deal of stress at home. Tr. at 305. She endorsed symptoms that included fatigue and weakness, blurred vision, sinus congestion, frequent headaches, depression, anxiety, memory loss, loss of appetite, and hay fever. Tr. at 306–07. Dr. Grieshop noted Plaintiff was tearful at times, but was alert and cooperative with appropriate affect, normal concentration, and normal attention span. Tr. at 308–09. He indicated the most recent lab work showed Plaintiff to have decreased thyroid-stimulating hormone ("TSH") and elevated thyroxine ("T4"). Tr. at 309. He explained that thyroid dysfunction was a known adverse effect of the treatment and that the effect might be permanent. *Id.* Dr. Grieshop noted Plaintiff had lost some weight on therapy and that her blood pressure had improved with the weight loss. *Id.*

On October 25, 2012, Plaintiff reported feeling better over the prior four-week period and having less stress at home. Tr. at 299. She complained of insomnia and trouble staying asleep, sore throat, constipation, back and joint pain, vertigo, and unusual weight change. Tr. at 300–01. Dr. Grieshop observed no abnormalities on examination. Tr. at 302. He indicated Plaintiff had mild hypothyroidism, but was relatively asymptomatic. *Id.* He assessed cirrhosis and thrombocytopenia. *Id.* He noted Plaintiff's depressed mood

had improved with Citalopram. Tr. at 303. He indicated he would obtain labs and planned to continue Plaintiff's therapy for sixteen more weeks. *Id.*

Plaintiff presented to W. Russell Rowland, M.D. ("Dr. Rowland"), for a consultative examination on November 19, 2012. Tr. at 468–73. She reported liver disease, thyroid problems, high blood pressure, low back pain, left shoulder pain, left lower extremity weakness, intermittent hand stiffness without joint swelling, and one-to-two second periods of dizziness/lightheadedness. Tr. at 468. Plaintiff became tearful when talking about depression, but had good communication skills; could spell "world" backwards; could subtract serial threes from 100; understood cash transactions; and was oriented to month, date, year, day, location, and the name of the president. Tr. at 469. She was 5' 11" tall and weighed 236 pounds. Tr. at 470. She demonstrated normal range of motion ("ROM"), had 5/5 strength, and had 5/5 grip strength in her upper extremities. *Id.* She was able to flex her hips to 90 degrees and her knees to 140 degrees.[1] *Id.* Her ROM was otherwise normal. *Id.* She had 5/5 lower extremity strength and squatted 40%. *Id.* She demonstrated no crepitus, tenderness, joint effusion, or bony enlargement in her knees. *Id.* She had normal spinal alignment with no muscle spasm, tenderness, or sacroiliac tenderness. *Id.* Her ROM was normal in her cervical spine. *Id.* Plaintiff's lumbar flexion was reduced to 65 degrees and extension was reduced to 20 degrees.[2] *Id.* A straight-leg raising test was negative to 50 degrees bilaterally in the supine position and

---

[1] Normal knee flexion is to 150 degrees. Tr. at 472. Normal bilateral hip flexion is to 100 degrees. Id.

[2] Normal lumbar flexion is to 90 degrees and normal lumbar extension is to 25 degrees. Tr. at 472.

was negative in the seated position. *Id.* Plaintiff demonstrated 2+ deep tendon reflexes in her upper and lower extremities. *Id.* She had intact cranial nerves; no tremor; a normal sensory examination in her upper and lower extremities; and normal fine dexterity, rapid alternating movements, heel walking, toe walking, tandem gait, and finger-to-nose testing. Tr. at 471. An x-ray of Plaintiff's lumbar spine showed early degenerative disc disease at the L4-5 and L5-S1 levels and mild degenerative disc disease in the lower thoracic spine. Tr. at 464. X-rays of Plaintiff's bilateral knees indicated very subtle narrowing of the patellofemoral and medial tibiofemoral joint compartments, which suggested possible early chondromalacia. Tr. at 465 and 466. Dr. Rowland's impressions were hepatitis C, hypertension, chronic depression, past history of removal of benign thyroid nodule, obesity, low back pain with normal examination and no radiculopathy, normal bilateral knee examination, chronic malaise, chronic depression, and normal examination of the left shoulder. Tr. at 471. He indicated Plaintiff should follow up at Regenesis Clinic for hypertension and would benefit from having her dosage of Celexa increased from 20 to 40 milligrams. *Id.* He stated the following: "I think she should go back to work, but she says she does not have the strength. This could be related to depression." *Id.*

On November 21, 2012, Plaintiff requested that Dr. Grieshop prescribe medication for hypertension. Tr. at 508. She reported some difficulty over the prior four-week period and endorsed feeling stressed, depressed, jittery, and unsteady. *Id.* She also complained of easy bruising. *Id.* Dr. Grieshop noted a bruise on Plaintiff's left upper extremity. Tr. at

511. He refilled Plaintiff's prescription for Citalopram and added Atenolol for hypertension. *Id.*

State agency medical consultant William Cain ("Dr. Cain"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on December 3, 2012. Tr. at 85–86. He rated Plaintiff's RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balancing and climbing ramps/stairs; occasionally stooping, kneeling, crouching, and crawling; and never climbing ladders/ropes/scaffolds. *Id.* State agency medical consultant Adrian Corlette, M.D. ("Dr. Corlette"), assessed the same RFC on May 13, 2013. Tr. at 109–11.

Plaintiff presented to James N. Ruffing, Psy. D. ("Dr. Ruffing"), for a mental status examination on December 18, 2012. Tr. at 476–78. She reported numerous physical complaints and initially denied mental health problems. Tr. at 476. However, she stated she liked to stay home and sometimes felt depressed. *Id.* She indicated she felt worried and sorry for herself. *Id.* She endorsed abilities to care for her personal needs, to drive a car, to visit the store, to pay bills, to visit with friends and family, to order a meal at a restaurant, to prepare meals, and to clean and do laundry. Tr. at 477. Dr. Ruffing indicated Plaintiff completed the intake interview on her own and was adequately groomed and dressed. *Id.* He stated Plaintiff varied "from remaining calm with no acute emotional distress [to] becoming tearful." *Id.* He indicated Plaintiff had "some appropriate affect of normal range and intensity with a mild depression observed." *Id.*

11

Plaintiff endorsed symptoms of depression that included crying spells and feelings of sadness, worthlessness, hopelessness, helplessness, and uselessness. *Id.* She indicated she had low energy, absent libido, disturbed sleep, and anhedonia. *Id.* She denied having received inpatient or outpatient mental health treatment. *Id.* She also denied suicidal ideation and a history of suicidal behavior. *Id.* Plaintiff was fully oriented and demonstrated logical, relevant, coherent, and goal-directed thought processes. Tr. at 478. She showed no indications of psychosis or lack of reality contact. *Id.* Dr. Ruffing stated Plaintiff was "able to attend and focus without distractibility"; was able to recall three unrelated words immediately and after a five-minute delay; demonstrated adequate memory; showed abstract reasoning ability and judgment; demonstrated good mastery of cognitive faculties; had basic general knowledge; was able to perform simple calculations; and scored 30 of 30 points on Folstein's Mini-Mental Status Exam ("MMSE"). *Id.* He suspected Plaintiff had a history of alcohol abuse that was in remission and that her depressive symptoms could be either a mild dysthymic or an adjustment disorder with depressed mood. *Id.* He stated Plaintiff had the following capacities:

> She is able to understand and respond to the spoken word. She is able to attend and focus. She does show some depressive symptomatology, which may limit her concentration, persistence, and pace at times. She does appear capable of managing her finances, if awarded benefits.

*Id.*

On December 20, 2012, Plaintiff indicated she had been doing "a little better." Tr. at 501. Dr. Grieshop noted Plaintiff's blood pressure was a little elevated, but indicated

she was not tachycardic and that the Citalopram seemed to be helping. *Id.* Plaintiff reported blurred vision, constipation, vertigo, frequent headaches, depression, anxiety, and memory loss. Tr. at 503. A physical examination was unremarkable. Tr. at 504. Dr. Grieshop noted Plaintiff had some slight weight loss and multiple minor side effects, but no apparent infections. Tr. at 505. He prescribed Methimazole for hyperthyroidism. *Id.*

On December 27, 2012, state agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 83–84. He considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders. Tr. at 84. He found that Plaintiff had mild restriction of activities of daily living ("ADLs") and mild difficulties in maintaining social functioning and concentration, persistence, or pace. *Id.* He indicated the preponderance of evidence in the file suggested Plaintiff's alcohol abuse was in remission and that her mental impairments were non-severe. *Id.* State agency consultant Olin Hamrick, Jr., Ph. D. ("Dr. Hamrick"), considered the same Listings and assessed the same level of restriction on May 20, 2013. Tr. at 108–09.

On January 17, 2013, Plaintiff reported that she had experienced headaches, blurred vision, and right-sided abdominal pain over the prior four-week period. Tr. at 495. Dr. Grieshop indicated Plaintiff had tolerated the medications well over the prior month. Tr. at 499.

Plaintiff presented to the ER at Upstate Carolina Medical Center on February 20, 2013, with a complaint of pain and swelling in her right thumb. Tr. at 484. The attending

physician observed Plaintiff to have an abscess and diagnosed paronychia. Tr. at 486. He prescribed Cephalexin to treat the infection and Tramadol for pain. Tr. at 488.

Plaintiff followed up with Dr. Grieshop on February 21, 2013. Tr. at 489. She reported symptoms that included night sweats, blurred vision, earache, constipation, rash, wound drainage, vertigo, depression, and anxiety. Tr. at 491. Dr. Grieshop noted no abnormalities on examination. Tr. at 492. He indicated Plaintiff had completed 48 weeks of therapy for hepatitis C. Tr. at 493. He noted that Plaintiff had been "about the same" over the last month and seemed "to be tolerating medications reasonably well." *Id.* He indicated they would repeat the CBC, liver function tests, and the end of therapy viral load to determine if Plaintiff responded to therapy. *Id.* He also stated he would check Plaintiff's antibody levels and would repeat thyroid studies. *Id.* He indicated that if Plaintiff's test results consistently showed hypothyroidism, she may need to consider thyroid replacement therapy. *Id.* He stated anemia and leukocytopenia should improve. *Id.*

Plaintiff followed up with Dr. Grieshop on March 21, 2013, four weeks after completing treatment for hepatitis C. Tr. at 533. She reported good activity level and improved appetite, but complained of a headache. *Id.* Dr. Grieshop indicated the hepatitis C viral load was not detected in Plaintiff's last test results. *Id.* He assessed Hashimoto's thyroiditis, but indicated Plaintiff was unable to afford a referral to an endocrinologist. Tr. at 537. He stated anemia and leukocytopenia should improve. *Id.* He recommended Plaintiff follow up for reevaluation of her viral load in August. Tr. at 538.

Plaintiff endorsed symptoms that included fatigue, decreased energy, and cough on August 21, 2013. Tr. at 526. She weighed 252 pounds and reported she had gained all of the weight that she had previously lost during treatment for hepatitis C. *Id.* Dr. Grieshop indicated Plaintiff's hepatitis C viral load was not detected and that liver function studies were normal. *Id.* He noted no abnormalities on physical examination. Tr. at 529. He stated Plaintiff would like to have her hepatitis C status rechecked in a year, but indicated he expected her chance of relapse to be less than two percent. Tr. at 530. He also indicated a recent liver ultrasound showed coarsening of the texture, but no tumor or ascites. *Id.* He stated Plaintiff was aware of the potential for regression of liver disease and should repeat lab work and ultrasound in one year. *Id.* He noted that Plaintiff's thyroid status had "waned from hyperthyroid to euthyroid to hypothyroid and now back to hyperthyroid" and that her primary care physician should consider referring her to an endocrinologist. Tr. at 530–31. He indicated Plaintiff continued to have thrombocytopenia, as a result of cirrhosis. Tr. at 531.

On February 26, 2014, Plaintiff presented to Barbara C. Ray, M.D. ("Dr. Ray"), for medication refills and requested that her blood pressure medication be changed. Tr. at 517. She stated she had stopped taking Amlodipine because "it made her heart hurt." *Id.* She complained of migraine headaches and swelling in her feet. *Id.* Dr. Ray noted no abnormalities on physical examination, aside from an enlarged right thyroid lobe. Tr. at 517–18.

Plaintiff followed up for hypertension on March 26, 2014. Tr. at 514. Dr. Ray indicated the right side of Plaintiff's thyroid appeared to be enlarged and that her plantar

heel was abnormally tender. Tr. at 515. She assessed a goiter, thyroid disorder, essential hypertension, and plantar fasciitis. *Id.* She prescribed Meloxicam and recommended Plaintiff use heel cups. Tr. at 516.

On March 27, 2014, Plaintiff presented to Elaine Sunderlin, M.D. ("Dr. Sunderlin"), for an evaluation following abnormal thyroid test results. Tr. at 520. Plaintiff reported having undergone a left hemithyroidectomy in or around 2005, after having been diagnosed with a thyroid nodule. *Id.* Dr. Sunderlin noted that Plaintiff's TSH levels had fluctuated while she was receiving treatment for hepatitis C. *Id.* Plaintiff reported having significant fatigue that had been occurred for the past few years, but that had worsened over the prior six-month period. *Id.* She also complained of constant headaches and diarrhea. *Id.* She stated she had gained 40 pounds since August 2013. *Id.* Dr. Sunderlin observed Plaintiff to have an enlarged isthmus in her right thyroid lobe with bosselated texture, but no distinct nodule. Tr. at 522. She assessed Hashimoto's thyroiditis. *Id.* She indicated surgery to remove the residual thyroid lobe may be beneficial, but was not a viable option because Plaintiff lacked insurance. *Id.* She stated that if lab work showed Plaintiff to continue to have hyperthyroidism, she would likely need to start a low dose of Methimazole. *Id.*

Plaintiff reported a six-month history of leg pain on May 16, 2014. Tr. at 558. She endorsed lower back pain and described a sharp, shooting pain in her groin that she experienced if she stood for too long. *Id.* She stated she had problems with balance. *Id.* She indicated she was under a lot of stress. *Id.* Plaintiff stated she was unable to physically or emotionally cope with the demands of jury duty and requested that Dr. Ray

16

complete an excuse form. *Id.* Dr. Ray noted that Plaintiff's calf muscles were mildly tender. *Id.* She indicated Plaintiff's back was tender to palpation and that she had decreased ROM in her lumbar spine and greater pain with extension than with flexion. Tr. at 559. She described Plaintiff as having painful ROM in her left hip and tenderness in her groin. *Id.* Dr. Ray stated "[t]his patient is unfit for jury duty due to her physical and emotional disabilities." Tr. at 560.

On June 2, 2014, an x-ray of Plaintiff's lumbar spine showed focal L5-S1 degenerative change. Tr. at 557.

On June 30, 2014, Dr. Sunderlin indicated Plaintiff was taking five milligrams of Methimazole every other day. Tr. at 539. She indicated liver dysfunction and agranulocytosis were rare side effects of Methimazole. Tr. at 541. She stated Plaintiff's most recent liver function tests were normal, but that they would continue to monitor her liver function and would discontinue Methimazole if testing showed impaired liver function. *Id.*

On July 11, 2014, Plaintiff followed up with Dr. Ray and requested her medication be changed. Tr. at 554. She reported a daily frontal headache. *Id.* She indicated she took over-the-counter medication, but sometimes had to lie down if the medication did not relieve her pain. *Id.* She also complained of back symptoms, anxiety, and depression. *Id.* Dr. Ray noted no abnormal physical findings. Tr. at 554–55. She discontinued Lisinopril, prescribed Amlodipine, and refilled Plaintiff's other medications. Tr. at 555–56.

Plaintiff complained of hypertension, back pain, depression, headaches, right lower quadrant abdominal pain, and hot flashes on August 8, 2014. Tr. at 550. She stated

she had stopped taking Amlodipine because it caused edema in her legs. *Id.* She indicated her depression had improved since she started seeing a counselor. *Id.* Plaintiff weighed 261 pounds. Tr. at 551. Dr. Ray observed Plaintiff to have soft and tender right upper and lower abdominal quadrants. *Id.* She recommended Plaintiff lose weight, discontinue Amlodipine, and continue Propranolol. Tr. at 552. She ordered an abdominal computed tomography ("CT") scan and prescribed Tramadol and Hyoscyamine Sulfate. Tr. at 552–53. On August 12, 2014, the CT scan showed Plaintiff to have a small gallstone and small areas of mesenteric scarring from previous infection. Tr. at 548–49.

Behavioral health therapist Deborah E. Guilfoyle, LISW-CP ("Ms. Guilfoyle"), indicated in a letter that Plaintiff had presented for an initial behavioral health session on June 12, 2014, and had followed up on July 17 and August 14. Tr. at 547. She stated Plaintiff's diagnoses were mild, recurrent major depression and insomnia. *Id.* She indicated she was providing supportive psychotherapy, cognitive behavioral therapy, and brief solution focus. *Id.* She stated she had recommended Plaintiff continued to pursue additional behavioral help to assist her in coping with her depression. *Id.* She noted that Plaintiff's primary care physician had prescribed 20 milligrams of Fluoxetine. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 5, 2014, Plaintiff testified she last worked as a babysitter in 2010. Tr. at 46. She denied having received unemployment or workers'

compensation and indicated she received financial support from family and friends. Tr. at 46–47.

Plaintiff testified she had problems with her thyroid that sometimes caused her to experience difficulty swallowing and moving her neck. Tr. at 48. She stated she had difficulty sleeping, as well. *Id.* She indicated she felt tired and experienced frequent fatigue. Tr. at 49 and 50–51. She stated she felt dizzy nearly every day. Tr. at 50. Plaintiff endorsed pain on her right side that she indicated was coming from her liver. Tr. at 47. She stated she continued to experience pain after having completed treatment for hepatitis C. *Id.* She indicated she experienced some shortness of breath, but denied having been diagnosed with a lung problem. Tr. at 58.

Plaintiff also endorsed pain in her knees and back. Tr. at 47. She indicated her knee pain sometimes caused her to lose her balance. Tr. at 51. She stated she experienced swelling in her knees and ankles once a week. Tr. at 52. She rated the pain in her knees as a seven on a 10-point scale and indicated it was not always present. Tr. at 61. She described pain in her middle and lower back that radiated down the front of her legs and into her knees. Tr. at 53. She indicated her pain increased when she changed positions from sitting to standing or from standing to sitting. *Id.* She rated her pain as a nine on a 10-point scale. Tr. at 61. She testified she used Tylenol and Aleve to reduce her pain, but she denied receiving any relief from Tramadol and Meloxicam. Tr. at 53–55. She stated she had daily tension headaches that affected her eye and temple. Tr. at 54.

Plaintiff stated she was 6' tall and weighed 250 pounds. Tr. at 62. She indicated her weight prevented her from doing a lot of walking. *Id.* She testified she could walk less than a block. Tr. at 51. She stated she had difficulty bending and reaching. Tr. at 59.

Plaintiff testified she had been visiting a therapist for treatment of depression for three to four months. Tr. at 55 and 62. She stated she felt alone because her mother and brother had recently passed away. Tr. at 55–56. She indicated that being sick caused her to feel depressed. Tr. at 56. She endorsed crying spells that occurred every other day. *Id.*

Plaintiff testified she washed clothing, visited with her adult children, traveled to the store, and drove. Tr. at 56. She stated she did not drive often because she felt like she continued to move even after her car was stopped. Tr. at 56–57. She indicated she went shopping with her daughter, but was unable to shop for long periods. Tr. at 57. She testified her grocery bags were too heavy and that she required assistance with them. *Id.* She indicated she watched television. *Id.* She stated she cleaned her living room and kitchen, mopped once a week, and cleaned her bathroom with her daughter's assistance. Tr. at 57–58. She testified she prepared meals, washed dishes, ironed, and swept. Tr. at 63. She denied vacuuming, taking out trash, dusting, performing home maintenance, doing yard work, gardening, hunting, fishing, sewing, and crocheting. Tr. at 63–64. She denied regularly attending church services, going out to eat, and visiting parks, beaches, or lakes. Tr. at 65. She stated she used a computer and had a Facebook account. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Jeanette Clifford reviewed the record and testified at the hearing. Tr. at 66–74. The VE categorized Plaintiff's PRW as a cloth inspector,

*Dictionary of Occupational Titles* ("*DOT*") number 689.685-038, as medium with a specific vocational preparation ("SVP") of three; a security guard, *DOT* number 372.667-034, as light with an SVP of three; a schedule clerk, *DOT* number 215.367-014, as sedentary with an SVP of four; a kitchen helper, *DOT* number 318.687-010, as medium with an SVP of two; a sandwich maker, *DOT* number 317.664-010, as medium with an SVP of two; and a fast food worker, *DOT* number 311.472-010, as light with an SVP of two. Tr. at 70–71. She stated Plaintiff performed the duties of a security guard and a schedule clerk in a composite job that was light with an SVP of four. *Id.* She stated Plaintiff performed the jobs of kitchen helper, sandwich maker, and fast food worker in a composite job that was medium with an SVP of two. Tr. at 71. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; stand for six hours during an eight-hour workday; sit for six hours during an eight-hour workday; frequently climb and balance; occasionally stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. Tr. at 71–72. The VE testified that the hypothetical individual could perform Plaintiff's PRW in the composite job of security guard and scheduler. Tr. at 72. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a labeler, *DOT* number 920.687-126, with 1,792 positions in South Carolina and 154,254 positions nationally and a sander, *DOT* number 761.687-010, with 1,218 positions in South Carolina and 199,680 positions nationally. *Id.*

The ALJ next asked the VE to assume the individual would be limited as described in the first hypothetical question, but would be absent from the work station from minutes to hours each day. Tr. at 73. The VE testified that such behavior would not allow for full-time work on a sustained basis. *Id.*

The ALJ asked the VE if Plaintiff had any skills from PRW that transferred to the sedentary exertional level. *Id.* The VE stated she did not. *Id.* The ALJ asked if Plaintiff could perform any of her PRW if she were limited to lifting 10 pounds occasionally, standing and walking for two hours out of an eight-hour workday, and sitting for six hours out of an eight-hour workday. *Id.* The VE testified that it would not be appropriate to break down the composite job if Plaintiff could not perform her PRW as she actually performed it. Tr. at 74.

2.     The ALJ's Findings

In his decision dated November 17, 2014, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
2.     The claimant has not engaged in substantial gainful activity since December 31, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.     The claimant has the following severe impairments: knee pain, Hepatitis C. Hashimoto's Thyroiditis, and back pain (20 CFR 404.1520(c) and 416.920(c)).
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

22

The claimant can lift 20 pounds occasionally, lift 10 pounds frequently; stand for 6–8 hours; walk for 6–8 hours; and sit for 6–8 hours. Climbing and balancing frequently; stooping, kneeling, crouching, and crawling occasionally; and never climbing ropes, ladders or scaffolds. The claimant must avoid concentrated exposure to workplace hazards.

6. The claimant is capable of performing past relevant work as a security guard/scheduling clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 22–34.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not adequately assess Plaintiff's statements regarding the effect of her pain and other symptoms on her ability to perform work activity;

2) the ALJ erred in assessing Plaintiff's RFC; and

3) the ALJ erred in not finding that she was limited to sedentary work and disabled based on Medical-Vocational Rule 201.14.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

23

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b) and 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Credibility and Effect of Pain

Plaintiff argues the ALJ did not consider the credibility of her statements and pain complaints based on the factors in SSR 96-7p. [ECF No. 12 at 9–10]. She maintains the

record confirms frequent reports of back pain, knee pain, and fatigue. *Id.* at 9. She contends the ALJ did not set forth specific reasons for rejecting her testimony. *Id.* at 10–11. She argues the ALJ impermissibly relied on select portions of her testimony to undermine her allegations, but did not consider her testimony and the record as a whole. [ECF No. 14 at 2–3].

The Commissioner argues the ALJ permissibly discounted Plaintiff's credibility. [ECF No. 13 at 17]. She contends the ALJ appropriately found that Plaintiff's allegations were inconsistent with her daily activities, course of treatment, treatment notes, and the opinion evidence of record. *Id.* at 18–21.

"Once medical evidence is produced supporting the existence of a condition that could reasonably produce pain, the Commissioner must assess the effect of pain on the claimant's residual functional capacity." *Kearse v. Massanari*, 73 F. App'x 601, 603 (4th Cir. 2003). The ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's alleged symptoms to determine how they affect her ability to do basic work activities. SSR 96-7p. If the claimant's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ must consider her credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the claimant's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following:

1.      The individual's ADLs;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

The ALJ must support his credibility finding with evidence in the case record and must cite specific reasons for his credibility finding. *Id.* He must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.*

In *Mascio v. Colvin*, 780 F.3d 632, 639–40  (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence in the record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. at 28.

The ALJ reflected on the medical signs and laboratory findings of record. Tr. at 28 (acknowledging Plaintiff's history of left partial thyroidectomy and noting testing in April 2011 that showed Plaintiff to have normal cardiac functioning), 29 (indicating that Dr. Stroup had diagnosed hepatitis C; noting that Dr. Grieshop had diagnosed cirrhosis, but that an ultrasound showed no tumor or ascites and only mild splenomegaly; stating that Plaintiff completed 48 weeks of treatment for hepatitis C in February 2013; acknowledged that x-rays of Plaintiff's spine showed early degenerative disease at L4-5 and L5-S1 and mild degenerative disc disease in the lower thoracic spine; noting that x-rays of Plaintiff's bilateral knees "revealed very subtle narrowing of the patellofemoral and medial tibiofemoral joint compartments suggestive of possible early chondromalacia"; stating that Dr. Rowland observed Plaintiff to have normal gait and station, to require no assistive devices, to have normal ROM of the upper extremities and ankles, to have normal strength in the lower extremities, to have normal grip strength, and to demonstrate no crepitus, tenderness, joint effusion or bony enlargement of the knees; and indicating Dr. Ray observed Plaintiff to have normal ROM of the neck, full strength in all four extremities, and normal gait and station in August 2014), 30 (recognizing that Plaintiff's thyroid functioning varied, but that Plaintiff was eventually diagnosed with Hashimoto's thyroiditis and received a low dose of Methimazole), and 31

(stating that Plaintiff had normal thyroid function and required no medication during part of the relevant period and indicating Plaintiff was often described as having normal attention and concentration, had never been hospitalized for a mental disorder, and had normal mental status evaluations).

The ALJ considered Plaintiff's statements to her medical providers and in her testimony. Tr. at 28. He indicated Plaintiff reported to multiple medical providers that she was "unemployed" instead of "disabled"; received workers' compensation benefits for eight months after injuring her little finger on a job that she performed for two months; and stopped working as a babysitter because the family she worked for moved out of town. *Id.* He noted Plaintiff denied arthritis, muscle aches, musculoskeletal pain or stiffness, mental status changes, headaches, dizziness, anxiety, and depression in April 2011. *Id.* He stated Plaintiff denied chest pain, shortness of breath, bone pain, joint pain, muscle cramps, muscle weakness, and peripheral edema during multiple visits to her physicians. Tr. at 29. He noted that Plaintiff had described her dizziness to Dr. Rowland as only lasting for one to two seconds at a time. *Id.* He indicated Plaintiff did not complain to Dr. Ray of chronic back pain, bilateral knee pain, or side pain in March 2014. *Id.* The ALJ indicated Plaintiff had testified to having received no mental health treatment until shortly prior to the hearing. Tr. at 31. He pointed out that Plaintiff frequently denied anxiety and memory loss. *Id.*

The ALJ considered the statements of the treating and examining physicians. He noted that Dr. Rowland had observed Plaintiff to have normal examinations of her lower back, bilateral knees, and left shoulder. Tr. at 29. He acknowledged Dr. Ray's statement

that Plaintiff was to be excused from jury duty because of her "physical and emotional disabilities," but gave the statement little weight because Dr. Ray "appears to have relied heavily upon the claimant's subjective reporting"; indicated benign findings in subsequent treatment notes; and did not indicate Plaintiff experienced significant emotional stress until August 2014. Tr. at 30. The ALJ also acknowledged and gave great weight to the state agency consultants' statements, except to the extent that they declined to limit Plaintiff's exposure to hazards. *Id.* He stated Dr. Ruffing's findings supported a determination that Plaintiff had "no more than mild limitations in the paragraph B criteria." Tr. at 31.

The ALJ considered Plaintiff's ADLs and found that they were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Tr. at 28. He referenced Plaintiff's testimony. *Id.*, citing Tr. at 27 ("During a typical day, she might wash clothes, spend time with her children when they visit, and might go to the store . . . . She does not drive often; sometimes she takes her daughter to the store . . . . She cooks, washes dishes, folds clothes, irons, mops, sweeps and watches television. She traveled out of state, to Greensboro, North Carolina, during the relevant period. She uses the computer to look up things and has a Facebook account."). He cited Plaintiff's indications in a function report "that she lived alone, feeds herself, prepares meals, washes and irons clothes, cleans, drives a personal vehicle, manages finances independently, shops, watches television, listens to books on tape and to music, eats dinner with friends who visit, talks on the telephone, attends doctor appointments, and requires no assistive devices for ambulation." *Id.* He noted Plaintiff denied in her

testimony that she engaged in vacuuming, but informed Dr. Rowland that she did so. *Id.* He also stated Plaintiff had reported to Dr. Ruffing that she was able to pay for items using cash, checks, and an EBT card and that she dated a gentleman and visited his mother's house on occasion. *Id.*

The ALJ reflected on Plaintiff's treatment and medication. He indicated Plaintiff had received conservative treatment; had never required back or knee surgery; and had successfully completed treatment for hepatitis C. Tr. at 31. He noted that Dr. Sunderlin had suggested Plaintiff might benefit from removal of the residual thyroid lobe, but that such surgery had not been definitively advised. *Id.* The ALJ noted that Plaintiff had been noncompliant with blood pressure and thyroid medications. Tr. at 28–29. He indicated she had informed Dr. Sunderlin that she had been prescribed Synthroid, but had not taken the medication for several years. Tr. at 30. He acknowledged Plaintiff's indication that her noncompliance had resulted from financial constraints, but noted "there was no evidence that she sought free or low cost health care." Tr. at 31.

Upon initial inspection, it appears the ALJ considered the entire record in assessing Plaintiff's credibility. As detailed above, the ALJ considered the medical signs and laboratory findings, Plaintiff's testimony and her statements to her medical providers, the medical provider's statements, her ADLs, and the type of treatment she received. *See* Tr. at 28–31. Nevertheless, the ALJ's decision is devoid of reference to or discussion of the side effects that Plaintiff reported as a result of the 48-week treatment course for hepatitis C. This omission is particularly harmful because it appears that most of

Plaintiff's complaints center on problems that she developed during or after she started the treatment and that the problems were all potential side effects from the treatment.

On February 29, 2012, Dr. Grieshop warned Plaintiff that potential side effects from hepatitis C treatment included thinning of hair, permanent vision loss, additional thyroid dysfunction, cardiopulmonary problems, gastrointestinal problems, musculoskeletal problems, dermatologic problems, anal-rectal problems, hematologic problems, and psychiatric problems. Tr. at 358. One month later, Plaintiff reported symptoms that included fever, insomnia, blurred vision, eye pain, occasional eye burning, constipation, abdominal pain, and frequent headaches. Tr. at 346–47. On April 18, 2012, Plaintiff complained of constipation, dry skin, frequent headaches, memory loss, and confusion. Tr. at 341–42. Plaintiff reported feeling tired all the time on May 10, 2012, and Dr. Grieshop indicated testing from her last visit indicated she had developed anemia. Tr. at 335 and 338. Plaintiff endorsed symptoms that included fatigue, weight loss, blurred vision, nausea, rash, frequent headaches, depression, memory loss, confusion, and loss of appetite. Tr. at 336–37. On June 7, 2012, Plaintiff complained of anorexia, blurred vision, constipation, abdominal pain, itching, and frequent headaches. Tr. at 331–32. She reported constipation, eye irritation, abdominal pain, vaginal itching, frequent headaches, excessive thirst, and loss of appetite on July 5, 2012. Tr. at 323 and 324–25. On August 2, 2012, Plaintiff reported blurred vision, constipation, abdominal pain, muscle weakness, frequent headaches, foot tingling or burning, depression, anxiety, and memory loss. Tr. at 318–19. On August 30, 2012, Plaintiff complained of blurred vision, frequent headaches, depression, and memory loss. Tr. at 312–13. On September

27, 2012, Plaintiff reported fatigue and weakness, blurred vision, sinus congestion, frequent headaches, depression, anxiety, memory loss, loss of appetite, and hay fever. Tr. at 306–07. Dr. Grieshop indicated the most recent lab work showed Plaintiff to have decreased TSH and T4 and explained that thyroid dysfunction was not unexpected with hepatitis C treatment and may be permanent. Tr. at 309. Plaintiff complained of insomnia and trouble staying asleep, sore throat, constipation, back and joint pain, vertigo, and unusual weight change on October 25, 2012. Tr. at 300–01. On November 19, 2012, Dr. Rowland indicated he had expressed to Plaintiff that she should go back to work, but that she indicated she did not have the strength to do so. Tr. at 471. He indicated Plaintiff's depression might be hindering her ability to return to work. *Id.* On November 21, 2012, Dr. Grieshop indicated Plaintiff "continue[d] to struggle with medications," had "a depressed affect," and had "developed symptomatic hyperthyroidism." Tr. at 512. Plaintiff reported blurred vision, constipation, vertigo, frequent headaches, depression, anxiety, and memory loss on December 20, 2012. Tr. at 503. On January 17, 2013, Plaintiff reported headaches, blurred vision, and right-sided abdominal pain. Tr. at 495. She reported symptoms that included night sweats, blurred vision, earache, constipation, rash, wound drainage, vertigo, depression, and anxiety on February 21, 2013. Tr. at 491.

After completing treatment for hepatitis C, Plaintiff continued to report headaches, fatigue, musculoskeletal pain, depression, and anxiety and continued to have thrombocytopenia. She reported headaches on March 21, 2013, and endorsed fatigue and decreased energy on August 21, 2013. Tr. at 526 and 533. During the August 2013 visit, Dr. Grieshop noted that Plaintiff continued to have thrombocytopenia and that her thyroid

status had "waned from hyperthyroid to euthyroid to hypothyroid and now back to hyperthyroid." Tr. at 530–31. Plaintiff again reported migraine headaches on February 26, 2014. Tr. at 517. On March 27, 2014, she reported constant headaches and a two-year history of significant fatigue, but indicated it had worsened over the prior six-month period. Tr. at 520. She complained of anxiety and pain in her leg and lower back on May 16, 2014. Tr. at 558. On July 11, 2014, she reported daily frontal headaches, back pain, anxiety, and depression. Tr. at 554. Plaintiff complained of hypertension, back pain, depression, and headaches on August 8, 2014. Tr. at 550.

Although the ALJ considered most of the relevant factors in SSR 96-7p, he ignored evidence that did not support his conclusion that Plaintiff's statements were not entirely credible. If the ALJ had acknowledged this evidence, he might have reasonably concluded that Plaintiff's complaints were undermined by her course of treatment, ADLs, and some of the objective findings. However, because the ALJ's decision contains no reflection on Plaintiff's reports of side effects from treatment and continued symptoms following treatment, it is unclear from the decision whether he considered such evidence in concluding that Plaintiff's statements were not entirely credible. Thus, the ALJ's decision does not adequately explain which of Plaintiff's statements he chose to believe and which he chose to discredit and fails to build "an accurate and logical bridge" between the evidence of record and his credibility determination. *See Monroe*, 826 F.3d at 189. In light of the foregoing, the undersigned recommends the court find that substantial evidence does not support the ALJ's credibility determination.

2.    RFC Assessment

Plaintiff argues the ALJ erred in assessing her RFC. [ECF No. 12 at 8]. She maintains the ALJ erred in finding she could perform light work and failed to consider whether she could meet the strength demands of light work on a regular and continuing basis. *Id.* at 9. She contends the ALJ did not cite specific evidence to support his RFC assessment. [ECF No. 14 at 1].

The Commissioner argues the ALJ assessed Plaintiff's RFC after carefully considering the entire record. [ECF No. 13 at 15]. She maintains the ALJ relied on the state agency physicians' opinions to assess Plaintiff's RFC. *Id.* She contends the ALJ did not "rubber stamp" the state agency consultants' opinions, but added an additional restriction that Plaintiff must avoid concentrated exposure to workplace hazards. *Id.* at 16.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* In a case involving a claimant with multiple impairments, the ALJ must consider the combined effect of all the claimant's impairments in determining her RFC and disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*,

662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The agency's regulations "require that an ALJ consider a claimant's credibility before determining her residual capacity." *Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016), citing *Mascio*, 780 F.3d at 639. They also require that the ALJ consider all relevant evidence in the case record and resolve all inconsistencies and ambiguities. SSR 96-8p. Because the undersigned has recommended the court find the ALJ erred in assessing Plaintiff's credibility for his failure to consider Plaintiff's statements that related to side effects and long-term effects of treatment for hepatitis C, substantial evidence also fails to support his finding that Plaintiff had the RFC to perform a reduced range of light work.

### 3.    Medical-Vocational Rule 201.14

Plaintiff argues the evidence supports a finding that she is limited to sedentary work and directs a finding that she is disabled based on Medical-Vocational Rule 201.14.

[ECF No. 12 at 11]. The Commissioner maintains Plaintiff is asking the court to reweigh the evidence. [ECF No. 13 at 22–23].

The introduction to Appendix 2 to Subpart P of Part 404, better known as the Medical-Vocational Guidelines or "Grid Rules," states as follows:

> The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevent the performance of his or her vocationally relevant past work.

20 C.F.R. Part 404, Subpart P, App'x 2, § 200.00(a).

Medical-Vocational Guideline 201.14 directs a finding that a claimant is disabled where the claimant is limited to work at the sedentary exertional level; is closely approaching advanced age; is a high school graduate or more; engaged in PRW that was skilled or semiskilled; and lacks transferable skills to the sedentary exertional level. 20 C.F.R. Part 404, Subpart P, App'x 2, § 201.14.

Plaintiff was considered to be closely approaching advanced age at the time of the hearing. *See* Tr. at 46 (testifying she was 52 years old); *see also* 20 C.F.R. Part 404, Subpart P, App'x 2, § 200.00(g) (defining "[i]ndividuals approaching advanced age" as being between 50 and 54). She had a high school education and a history of PRW that was semiskilled, but that did not produce skills that were transferable to the sedentary exertional level. *See* Tr. at 46, 70–71, and 73. Thus, if the ALJ had found that Plaintiff had a maximum RFC for sedentary work, Medical-Vocational Guideline 201.14 would have directed a finding that she was disabled. However, the ALJ instead found that

Plaintiff had a maximum RFC for a reduced range of light work and could perform her PRW. *See* Tr. at 26–27 and 32.

The undersigned declines to find that the ALJ erred in not directing a finding of disability based on Medical-Vocational Guideline 201.14. It is not the role of this court to reweigh the evidence. *Hays v. Sullivan*, 907 F.3d 1453, 1456 (4th Cir. 1990). Although the undersigned has recommended the court find that the ALJ erred in assessing Plaintiff's credibility and RFC, the ALJ's error was one of omission in failing to consider relevant evidence. The evidence is not so one-sided that it would direct a conclusion that Plaintiff was limited to sedentary work. Therefore, the undersigned recommends the court find the ALJ did not err in failing to apply Medical-Vocational Guideline 201.14.

## III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

February 9, 2017                                    Shiva V. Hodges
Columbia, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).